IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EIBE SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-862-ECM-WC |
| | ) | (WO) |
| COFFEE COUNTY SHERIFF | ) | |
| DEPT., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

### I.      INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Eibe Scott, a state inmate, in which he challenges the adequacy of the medical treatment he received and his placement in confinement following surgery while incarcerated at the Coffee County Jail.  Specifically, Scott alleges that the defendants denied him adequate medical treatment for a broken finger he received in an altercation with a fellow inmate on October 3, 2016.  (Doc. 1 at p. 2).  He also alleges he was wrongly placed in "D.C. confinement" following his surgery and that the Coffee County Jail has inadequate grievance procedures.  *Id.*  Scott names Byron Caylor, Jail Administrator, as the correctional defendant.  He also names multiple medical providers as defendants including Quality Correctional Health Care, Brenda Stuckey, L.P.N, and Dr. Jerry N. Gurley.

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

The defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Scott's medical records, addressing the claims raised in the complaint, as amended.  In these documents, the medical and correctional defendants maintain they did not act with deliberate indifference to Scott's medical needs and the correctional defendants deny they subjected Scott to unconstitutional conditions.

After reviewing the special reports filed by the defendants, the court issued an order on September 15, 2017, directing Scott to file a response to each of the arguments set forth by the defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  (Doc. 54 at 1–2).  The order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." *Id.*  Scott filed a sworn response to this order on September 21, 2017.  (Doc. 55).

Pursuant to the directives of the order entered on September 15, 2017, the court now treats the defendants' reports as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II.     FACTS

At the time this action was filed, the plaintiff was an inmate at the Coffee County Jail.  He was booked in the facility on September 30, 2016, and charged with three counts of possession of a controlled substance, possession of marijuana in the first degree, attempt to elude, and violation of his probation.  (Doc. 17-1).  On October 3, 2016, a correctional officer observed the plaintiff strike another inmate inside the cell.  (Doc. 17-3).   The correctional officer notified the shift office of this incident and then he and two other officers entered the cell to intervene.  (Doc. 17-3).  During this altercation, the plaintiff hit a wall and broke his finger.  (Doc. 16-2 at p. 4).  Following the incident, the plaintiff was taken to disciplinary lock down for fighting.  (Doc. 17-3).

After his injury, he alleges that "I was denied to be taken to the hospital for (8) days[.]  I was made to lay on the concrete floor and received [sic]literally no medical care. On the (3rd) day the radiologist came to xray(s) and confirmed the finger was broken and needed surgery."  (Doc. 1 at p. 2).  During this time, he alleges that he was only provided Naproxen for pain.  (Doc. 1-1).  He also states that he saw Nurse Brenda Stuckey on the day of the incident and she told him "that she would see how bad it would swell overnight". The next day Nurse Stuckey advised him that the radiologist would be coming to the jail. (Doc. 1-1 at p. 1).  On October 12, 2016, he was taken to an outside medical provider for surgery and then was returned to Coffee County Jail.  *Id.*

Upon his return to the jail, the plaintiff alleges that he was placed in "D.C. confinement (per B. Caylor) because of the surgery, instead of housed in the front holding cell (which is normally used for medical) because of a personal vendetta by Mr. Caylor."

*Id.*  As a result of his placement in confinement he alleges that "he has no access to the courts, no access to the phone, no access to visits, or communications with friends or family."  *Id.*

On October 15, 2016, the plaintiff filed a grievance with the Jail Administrator, Defendant Byron Caylor, and states that he received no response.  *Id.*  In this grievance, he complains that he has not been able to see his family since his surgery and he is wrongfully held in cell block #3 without a bunk bed or a cot.  (Doc. 17-7).  In response to this grievance, Administrator Caylor notified the on-duty shift supervisor to tell Scott that the medical staff recommended that he not be sent back to a general population cell unit and that he was under disciplinary lockdown for assaulting another inmate.  (Doc. 17-2 at pp. 4–5). Further, Caylor testified that the plaintiff was housed in cell block #3 because he had been prescribed a narcotic following surgery.  *Id.* at pp. 4-5.  According to Caylor, cell block #3 consists of 4 different cell units which house inmates who are held under disciplinary lockdown, protective custody, or medical isolation.  *Id.* at p. 4.  In further response to this grievance, Caylor provided the plaintiff a bunk bed[2], and allowed his family to visit[3]. (Doc. 17-2 at pp. 4–5).

With respect to the grievance procedure at Coffee County Jail, Administrator Caylor testified as follows:

> "[i]t is the policy of the Coffee County Jail that inmates are permitted to submit grievances to the jail administrator and that each grievance will receive a response.  An inmate wishing to file a grievance will be provided

---

[2]  Prior to receiving a bunk bed, the plaintiff was provided a mat to sleep on.  *Id.* at p. 4.

[3]  The plaintiff wrote Caylor acknowledging the visit and thanking him.  (Doc. 17-8).

> with an inmate grievance form upon request.  Completed grievance forms
> will be delivered promptly to me, and I will respond to the grievance.  If an
> inmate is unsatisfied with the decision I make, they may appeal such decision
> in writing to Sheriff Sutton within seventy-two (72) hours of the receipt of
> said grievance."

(Doc. 17-2 at p. 4).

Also, on October 15, 2016, the plaintiff filed a form entitled "Medical Grievance,"

wherein he complains that he was not taken to the emergency room and that he had to wait

eight days before being seen by an outside medical provider.  He also complained that he

was housed in cell block #3 when he was supposed to be on medical observation.  (Doc. 1-

2 at p. 2).  The same day Nurse Stuckey replied in writing to the grievance as follows:

> "[t]here was not a need for you to go to the ER because the radiology
> technician comes here to do the x-rays.  Your appointment was scheduled
> with Southern Bone & Joint as soon as they could see you.  You were taking
> Naprosyn for pain until your surgery.  You are in cell block #3 because you
> can not be in regular population due to your surgery.  Capt. Caylor placed
> your in 3# block.  I do not decide which block you are placed in and I have
> nothing to do with you getting a bed or not getting a bed."

*Id.*

On October 16, 2016, the plaintiff filed another "Medical Grievance" wherein he

requested information about his medication prescribed by Dr. Fleming Brooks at Southern

Bone and Joint.  He also complained that "things got unprofessional" with Nurse Moa

when he mentioned making a complaint about his medical care.  (Doc. 1-2 at p. 1).  On

October 18, 2016, Nurse Stuckey replied in writing to the grievance as follows:

> "[w]hile you were in Coffee County Jail you are under the care of the medical
> doctors contracted to the jail.  They are the ones that state what medication
> you can take and how long you can take them not Dr. Brooks.  I do not know
> about any words becoming unprofessional or harsh by Nurse Mo.  I have
> already spoken with her."

*Id.* With respect to the medical care provided to the plaintiff, Nurse Stuckey testified as follows:

> At all times while Scott was incarcerated at the Coffee County Jail, he received timely and appropriate medical care.  I have personal knowledge regarding the care and treatment I provided to Scott in October and November 2016.
>
> On October 3, 2016 at 5;15 p.m., Scott reported that he hit a wall with his right hand.  At that time, I observed that Scott's hand was swollen.  There was no obvious broken bone or deformity in his right hand.  At that time, in my medical judgment, it was reasonable and appropriate to see how Scott's right hand responded to ice and to perform a follow-up evaluation the following day.  I offered Scott an ice pack and a sick call slip.  Scott refused the sick call slip.  I instructed Scott to apply the ice pack and to keep his hand elevated.  I also told Scott that I would reexamine his hand the following day.
>
> At 7:00 a.m. the next day, October 4, 2016, I examined Scott's right hand.  At that time, I observed that Scott's hand was still swollen and he reported that it was painful.  Because of the swelling and his report of pain in his right hand, I ordered an x-ray on his hand.  I also instructed Scott to keep his hand elevated to prevent further swelling.  On October 4, 2016, Scott received an x-ray from Vuepoint Diagnostics.  Vue point Diagnostics provides portable x-ray services and came to the Coffee County Jail to perform an x-ray on Scott's right hand.  The x-ray on Scott's right hand showed a fracture of the fourth metacarpal neck with angulation.
>
> Once I received the results of the x-ray, I contacted Dr. Jerry Gurley, who is a physician employed by QCHC.  I told Dr. Gurley the result of the x-ray on Scott's right hand.  Dr. Gurley gave me a telephone order to make arrangements for Scott to see an orthopedic doctor.  Dr.  Gurley also gave me a telephone order to dispense Ibuprofen 400 mg to Scott twice daily for five days.  Ibuprofen is a NSAID, non-steroidal anti-inflammatory drug that is used to treat pain.  As indicated on the Medication Administration Record (MAR), Scott received the Ibuprofen from October 4, 2016 until October 6, 2016.
>
> On October 6, 2016, I contacted Southern Bone and Joint to make Scott an appointment.  Scott's appointment was scheduled by Southern Bone and Joint for October 11, 2016.  On October 6, 2016, Dr. Kern discontinued the Ibuprofen and ordered Naproxen 500 mg to be given twice daily for seven days.  Naproxen is a NSAID, non-steroidal anti-inflammatory drug that is used to treat pain.  As demonstrated by the MAR, Scott was given Naproxen 500 mg as ordered.

On October 11, 2016, Scott was seen by Dr. Fleming Brooks at Southern Bone and Joint Specialists. According to Dr. Brooks note, Scott needed surgery on his right fourth metacarpal. Dr. Brooks also applied a splint to Scott's finger. Dr. Brooks scheduled Scott for surgery for October 12, 2016.

On October 12, 2016, Dr. Brooks performed surgery on Scott's right fourth metacarpal at Medical Center Enterprise in Enterprise, Alabama. Dr. Brooks prescribed Scott Percocet 7.5/325 to be taken every 4-6 hours as need for pain. Dr. Brooks also prescribed Naprosyn 500 mg to be taken twice daily and scheduled a follow-up appointment for Scott on October 25, 2016.

When Scott returned from surgery on October 12, 2016, I contacted Dr. Johnny Bates, the CEO of QCHC, and provided him with a report on Scott's surgery. Dr. Bates gave me a telephone order to give Scott Percocet 7.5/325 every four to six hours for 24-48 hours to treat his post-surgical pain. Based on this verbal order and as demonstrated on the MAR, Scott received Percocet 7.5/325 every six hours beginning after he returned from surgery on October 12, 2016 and ending on October 15, 2016. Naprosyn 500 mg was then prescribed for Scott to be given twice daily beginning on October 16, 2016 until his scheduled follow-up appointment at Southern Bone and Joint on October 25, 2016. As indicated on the MAR, Scott received Naprosyn as ordered from October 16, 2016 until October 25, 2016.

On October 25, 2016, Scott had a follow up appointment with Dr. Brooks at Southern Bone and Joint Specialists. According to the medical record, Scott did not have any new complaints. Scott's sutures were removed and he was placed in a few splint. A follow up appointment was scheduled in two weeks. On October 25, 2016, Dr. Bates gave me a telephone order to give Scott Naprosyn 500 mg twice daily for ten days. From October 26, 2016 until October 27, 2016, Scott took Naprosyn 500 mg twice daily. Beginning on the evening of October 27, 2016, Scott refused to take Naprosyn 500 mg and did not take Naprosyn again after October 27, 2016.

On November 9, 2016, Scott had a second follow-up appointment with Dr. Brooks at Southern Bone and Joint Specialists. According to the medical record, Scott reported that he was doing better. Scott was placed in a n Orthoglass splint and a follow-up visit was scheduled in three weeks.

Based on my review of his medical records from the Coffee County Jail and my personal recollection of the treatment I provided to him, Scott was not denied access to medical evaluation or treatment at any time. Based on my review of his medical records from the Coffee County Jail, Scott's requests for evaluation were neither ignored nor his treatment delayed. In my opinion, the treatment I provided to Scott during his incarceration at the Coffee County Jail was reasonable and appropriate. In my opinion, the treatment I provided to Scott during his incarceration at the Coffee County Jail exceeded the standard of care.

(Doc. 16-2 at pp. 3-8).

## III.   DISCUSSION[4]

### A.      Absolute Immunity — Correctional Defendants

To the extent Scott lodges claims against the correctional defendant, Bryon Caylor, in his official capacity and seeks monetary damages, this defendant is entitled to absolute immunity.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. *Id*.  Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).  Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

---

[4] The court limits its review to the allegations set forth in the complaint, as amended.  (Docs. 1, 30). *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dept. of Corr.*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14. The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir. 1990)). In light of the foregoing, defendant Byron Caylor, is entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from him in his official capacity. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

## B. Deliberate Indifference Generally

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh*

*v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001) *abrogated on other grounds by Bell Atl. Corp v. Twombly,* 550 U.S. 544 (2007).  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . .  [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer,* 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834–38, 114 S. Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324–25, 115 L. Ed. 2d 271 (1991). . . .  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (internal quotation marks omitted).  A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . .  Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).  Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).  Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*

## C.    Deliberate Indifference to Medical Needs.

Scott alleges that the medical defendants acted with deliberate indifference to his medical needs when they denied him adequate medical treatment for a broken finger he received in an altercation with a fellow inmate on October 3, 2016.  (Doc. 1 at p. 2).  Furthermore, to the extent Clark can be understood to complain that the correctional defendant, Byron Caylor, the Jail Administrator, is responsible for ensuring that he received appropriate medical treatment, the court will also address this argument.  (Doc. 1-1 at p. 1).  These assertions entitle Scott to no relief.

### 1.  Standard of Review

That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something

11

more must be shown.  Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely

accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).

In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those

responsible for it were deliberately indifferent." *Massey v. Montgomery Cty. Det. Facility*,

646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques or forms of

treatment is a classic example of a matter for medical judgment and therefore not an

appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d

at 1545 (citation and internal quotation marks). To show deliberate indifference, the

plaintiff must demonstrate a serious medical need and then must establish that the

defendant's response to the need was more than "merely accidental inadequacy, negligence

in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*,

221 F.3d at 1258 (citation and internal quotation marks omitted); *Garvin v. Armstrong*, 236

F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition

should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm.").

## 2.  Medical Defendants

Scott alleges that the medical defendants acted with deliberate indifference to his medical needs when they denied him adequate medical treatment for a broken finger he received in an altercation with a fellow inmate on October 3, 2016.  (Doc. 1 at p. 2).  More specifically, he alleges that "I was denied to be taken to the hospital for (8) days[.] I was made to lay on the concrete floor and received [sic] literally no medical care.  On the (3rd) day the radiologist came to xray(s) and confirmed the finger was broken and needed surgery."  (Doc. 1 at p. 2).  During this time, he alleges that he was only provided Naproxen for pain.  (Doc. 1-1).  He also states that he saw Nurse Brenda Stuckey on the day of the

incident and she told him "that she would see how bad it would swell overnight".  The next day Nurse Stuckey advised him the radiologist would be coming to the jail.  (Doc. 1-1 at p. 1).  On October 12, 2016, the plaintiff was taken to an outside medical provider for surgery and then was returned to Coffee County Jail.  *Id.*

The medical defendants adamantly deny they acted with deliberate indifference to Scott's medical needs during the time relevant to this complaint or at any other time.  Instead, these defendants maintain that following the altercation on October 3, 2016, the Coffee County Jail medical staff prescribed pain medications for him, treated his broken finger, and referred him for further evaluation and surgery by an off-site specialist.  The defendants submitted affidavits and relevant medical records in response to the complaint filed by Scott.  The affidavits are corroborated by the objective medical records contemporaneously compiled during the treatment process.  (Docs. 16-1 at pp. 2–44; 16-2 at pp. 2–8; 38-1 at pp. 2–5).

Specifically, Defendant Nurse Stuckey, who personally examined Scott's broken finger immediately following the injury and provided treatment to him, reviewed the pertinent medical records and testified by affidavit concerning her own personal knowledge and review of the records as follows:

> At all times while Scott was incarcerated at the Coffee County Jail, he received timely and appropriate medical care.  I have personal knowledge regarding the care and treatment I provided to Scott in October and November 2016.
> On October 3, 2016 at 5;15 p.m., Scott reported that he hit a wall with his right hand.  At that time, I observed that Scott's hand was swollen.  There was no obvious broken bone or deformity in his right hand.  At that time, in my medical judgment, it was reasonable and appropriate to see how Scott's right hand responded to ice and to perform a follow-up evaluation the

16

following day.  I offered Scott an ice pack and a sick call slip.  Scott refused the sick call slip.  I instructed Scott to apply the ice pack and to keep his hand elevated.  I also told Scott that I would reexamine his hand the following day.

At 7:00 a.m. the next day, October 4, 2016, I examined Scott's right hand.  At that time, I observed that Scott's hand was still swollen and he reported that it was painful.  Because of the swelling and his report of pain in his right hand, I ordered an x-ray on his hand.  I also instructed Scott to keep his hand elevated to prevent further swelling.  On October 4, 2016, Scott received an x-ray from Vuepoint Diagnostics.  Vue point Diagnostics provides portable x-ray services and came to the Coffee County Jail to perform an x-ray on Scott's right hand.  The x-ray on Scott's right hand showed a fracture of the fourth metacarpal neck with angulation.

Once I received the results of the x-ray, I contacted Dr. Jerry Gurley, who is a physician employed by QCHC.  I told Dr. Gurley the result of the x-ray on Scott's right hand.  Dr. Gurley gave me a telephone order to make arrangements for Scott to see an orthopedic doctor.  Dr. Gurley also gave me a telephone order to dispense Ibuprofen 400 mg to Scott twice daily for five days.  Ibuprofen is a NSAID, non-steroidal anti-inflammatory drug that is used to treat pain.  As indicated on the Medication Administration Record (MAR), Scott received the Ibuprofen from October 4, 2016 until October 6, 2016.

On October 6, 2016, I contacted Southern Bone and Joint to make Scott an appointment.  Scott's appointment was scheduled by Southern Bone and Joint for October 11, 2016.  On October 6, 2016, Dr. Kern discontinued the Ibuprofen and ordered Naproxen 500 mg to be given twice daily for seven days.  Naproxen is a NSAID, non-steroidal anti-inflammatory drug that is used to treat pain.  As demonstrated by the MAR, Scott was given Naproxen 500 mg as ordered.

On October 11, 2016, Scott was seen by Dr. Fleming Brooks at Southern Bone and Joint Specialists.  According to Dr. Brooks note, Scott needed surgery on his right fourth metacarpal.  Dr. Brooks also applied a splint to Scott's finger.  Dr. Brooks scheduled Scott for surgery for October 12, 2016.

On October 12, 2016, Dr. Brooks performed surgery on Scott's right fourth metacarpal at Medical Center Enterprise in Enterprise, Alabama.  Dr. Brooks prescribed Scott Percocet 7.5/325 to be taken every 4-6 hours as need for pain.  Dr. Brooks also prescribed Naprosyn 500 mg to be taken twice daily and scheduled a follow-up appointment for Scott on October 25, 2016.

When Scott returned from surgery on October 12, 2016, I contacted Dr. Johnny Bates, the CEO of QCHC, and provided him with a report on Scott's surgery.  Dr. Bates gave me a telephone order to give Scott Percocet 7.5/325 every four to six hours for 24-48 hours to treat his post-surgical pain.  Based on this verbal order and as demonstrated on the MAR, Scott received

Percocet 7.5/325 every six hours beginning after he returned from surgery on October 12, 2016 and ending on October 15, 2016.  Naprosyn 500 mg was then prescribed for Scott to be given twice daily beginning on October 16, 2016 until his scheduled follow-up appointment at Southern Bone and Joint on October 25, 2016.  As indicated on the MAR, Scott received Naprosyn as ordered from October 16, 2016 until October 25, 2016.

On October 25, 2016, Scott had a follow up appointment with Dr. Brooks at Southern Bone and Joint Specialists.  According to the medical record, Scott did not have any new complaints.  Scott's sutures were removed and he was placed in a few splint.  A follow up appointment was scheduled in two weeks.  On October 25, 2016, Dr. Bates gave me a telephone order to give Scott Naprosyn 500 mg twice daily for ten days.  From October 26, 2016 until October 27, 2016, Scott took Naprosyn 500 mg twice daily.  Beginning on the evening of October 27, 2016, Scott refused to take Naprosyn 500 mg and did not take Naprosyn again after October 27, 2016.

On November 9, 2016, Scott had a second follow-up appointment with Dr. Brooks at Southern Bone and Joint Specialists.  According to the medical record, Scott reported that he was doing better.  Scott was placed in an Orthoglass splint and a follow-up visit was scheduled in three weeks.

Based on my review of his medical records from the Coffee County Jail and my personal recollection of the treatment I provided to him, Scott was not denied access to medical evaluation or treatment at any time.  Based on my review of his medical records from the Coffee County Jail, Scott's requests for evaluation were neither ignored nor his treatment delayed.  In my opinion, the treatment I provided to Scott during his incarceration at the Coffee County Jail was reasonable and appropriate.  In my opinion, the treatment I provided to Scott during his incarceration at the Coffee County Jail exceeded the standard of care.

(Doc. 16-2 pp. 3–8).  Defendant Dr. Jerry Gurley, who directed treatment of Scott's broken finger while he was housed a Coffee County Jail, also filed an affidavit which confirms that Scott's treatment was conducted as stated by Nurse Stuckey and testifies that the treatment "provided to Scott exceeded the standard of care."  (Doc. 38-1 at pp. 2–5).  The medical records further confirm that medical personnel at Coffee County Jail assessed Scott's need for treatment, prescribed medications to alleviate the pain associated with his condition when they deemed such necessary, referred him for outside treatment which

included surgery and provided treatment to Scott in accordance with their professional judgment. (Doc. 16-1 at pp. 2–44).

To the extent that Scott claims the medical defendants failed to respond to his grievances, the records show that these complaints are baseless.   First, concerning the "Medical Grievance" filed on October 15, 2016, the plaintiff complains that after he broke his finger, he was not taken to the emergency room and that he had to wait eight days before being seen by an outside medical provider.  He also complained that he was housed in cell block #3 when he was supposed to be on medical observation.  (Doc. 1-2 at p. 2).  The same day Nurse Stuckey replied in writing to the grievance as follows:

> "[t]here was not a need for you to go to the ER because the radiology technician comes here to do the x-rays.  Your appointment was scheduled with Southern Bone & Joint as soon as they could see you.  You were taking Naprosyn for pain until your surgery.  You are in cell block #3 because you can not be in regular population due to your surgery.  Capt. Caylor placed your in 3# block.  I do not decide which block you are placed in and I have nothing to do with you getting a bed or not getting a bed."

*Id.*

Second, concerning the "Medical Grievance" filed on October 16, 2016, the plaintiff requested information about his medication prescribed by Dr. Fleming Brooks at Southern Bone and Joint and complained that "things got unprofessional" with Nurse Moa when he mentioned making a complaint about his medical care.  (Doc. 1-2 at p. 1).  On October 18, 2016, Nurse Stuckey replied in writing to the grievance as follows:

> "[w]hile you were in Coffee County Jail you are under the care of the medical doctors contracted to the jail.  They are the ones that state what medication you can take and how long you can take them not Dr. Brooks.  I do not know about any words becoming unprofessional or harsh by Nurse Mo.  I have already spoken with her."

19

*Id.*  The Court has independently reviewed the supporting grievance documents and concludes that Defendant Nurse Stuckey responded to all of Scott's grievances and ensured Scott received an x-ray and was seen by the outside medical provider and explained the procedure for receiving medications.  Accordingly, the Court concludes that to the extent the plaintiff complains about the medical defendants' responses to his grievances, those complaints lack merit.

Indeed, after carefully reviewing the medical records in this case, the court concludes that the course of treatment undertaken by the medical staff at Coffee County Jail did not violate Scott's constitutional rights.  Specifically, there is no evidence upon which the court could conclude that any member of the medical staff who provided treatment to Scott acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  Furthermore, whether medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted).  In addition, to the extent Scott complains that his physicians should have allowed continuous prescriptions for pain relievers or pursued a mode of treatment other than that prescribed, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate

indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference.  Indeed, Scott's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records.  *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same).  In addition, Scott has failed to present any evidence showing that the manner in which the medical defendants addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded.  The record is therefore devoid of evidence—significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Scott.  Consequently, summary judgment is due to be granted in favor of the medical defendants.

### 3.  Correctional Defendant

To the extent Scott argues that the Correctional Defendants acted in a manner to prevent him access to treatment from professional medical personnel while incarcerated in the Coffee County Jail, the Court concludes that this argument lacks merit.  Indeed, it is

clear from the medical records that the correctional defendants were not in any way involved in decisions regarding the medical treatment provided to Scott as these decisions are made solely by healthcare professionals employed by Quality Correctional Health Care.

Accordingly, the Court concludes that Scott has failed to establish deliberate indifference on the part of the correctional defendants.  Specifically, Scott has not demonstrated that these defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Scott's health.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  Indeed, Defendant Caylor testified by affidavit that he "was personally unaware that Scott had injured his right hand until being informed that he was going to need surgery."  Consequently, summary judgment is due to be granted in favor of Defendant Caylor on Scott's claim alleging deliberate indifference arising from the actions of medical personnel in treating his pain.

Insofar as Scott seeks to hold the correctional defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge

that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that Defendant Caylor exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . .  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties.  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.

2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for actions of the correctional defendants could attach to the other named defendants only if these defendants "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that Defendant Caylor did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Scott. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the treatment provided to Scott and provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, Defendant Caylor can be held liable for decisions of medical personnel only if he undertook actions which bear a causal relationship to the purported violation of Scott's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Scott must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy

[that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Scott has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that Defendant Caylor directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Scott has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Scott had continuous access to medical personnel and received treatment for his pain.  The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of Defendant Caylor with respect to liability based on the theory of respondeat superior.  Furthermore, even had Scott presented a proper basis for the claims lodged against the correctional defendants, the evidentiary materials before the court, including Scott's

medical records, demonstrate that health care personnel did not act with deliberate indifference to his medical needs.

### D.    Deliberate Indifference -- Challenge to Conditions

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).   Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment.   *Id*.   Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46.   Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349).   Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny.   *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517,

526–27 (1984)); *Helling*, 509 U.S. at 31–32.  For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004).  As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834.  The court previously identified the applicable standard relevant to establishment of the objective and subjective elements of an Eighth Amendment claim. *See supra*. at 5–6.

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes,* 452 U.S. at 347.  "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards.  *Hamm v. De Kalb Cty.*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986); *see Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme

Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . .  To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes.  Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991) (emphasis in original).

As previously noted, a prison official may likewise be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828. "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted).  As the foregoing makes clear, mere negligence "does not justify liability under section 1983[.]" *Id.*

The plaintiff alleges that his constitutional rights were violated because after being confined to disciplinary confinement due to his assault of another inmate, he was not provided a bed, but was forced to sleep on a mat on the floor before and after surgery for a broken finger.  (Doc. 1-1).  He further alleges that as a result of his placement in confinement he was "denied any visits, phone calls or any communication with family or

attorneys." (Doc. 1 at p. 2). He also alleges that he filed a grievance about these matters with Defendant Caylor, but was never provided a response. *Id.*

First, the Court will address the plaintiff's claim that his lack of a bed in lock up before and after surgery for a broken finger constituted deliberate indifference. The Eleventh Circuit has specifically held that in the prison context "temporarily ha[ving] to sleep upon a mattress on the floor or on a table is not necessarily a constitutional violation". *Hamm,* 774 F.2d at 1566. However, the Eleventh Circuit cautioned that the lower court should have "expressly considered the claims [of conditions and medical treatment] together." *Id.* at 1567. The Court will do so now.

Indeed, the Court is persuaded that its prior conclusion -- the medical defendants provided constitutionally adequate medical care to plaintiff for his broken finger-- undermines his conditions claim. Specifically, immediately following the incident the plaintiff was provided "an ice pack" and instructed to "keep his hand elevated". The next day he was x-rayed and received ibuprofen which was changed two days later to Naproxen. (Doc. 16-2 pp. 4–6). Furthermore, after surgery the plaintiff received Percocet and Naproxen. (Doc. 16-2 at pp. 6–7). The Court recognizes that the plaintiff, whether injured or uninjured, would have been more comfortable in a bed than on a mat and that when injured a pillow or other implement would have made it easier to elevate his hand. However, the Court also recognizes that the Constitution does not require "comfortable prisons" and the Court now concludes that these conditions the plaintiff experienced do not rise to the level of being "inhumane". *See, Farmer*, 511 U.S. at 832. Moreover, the Court recognizes that the lack of a bed was temporary as Defendant Caylor ultimately provided

the plaintiff a bed in lock up even though those units are not typically provided beds.  (Doc. 17-2).  Thus, the Court concludes that the failure to provide a bed to plaintiff while in disciplinary lock up both before and immediately after surgery for his broken finger, fails to establish deliberate indifference on the part of defendants.  Accordingly, the Court concludes that the plaintiff's allegations fail to satisfy the objective element of an Eighth Amendment violation and summary judgment is therefore due to be granted on this claim. *Caldwell*, 748 F.3d at 1099.

### E.       Due Process Claim

The plaintiff, a convicted inmate, (Docs. 20; 20-1; 20-2) alleges that he was "treated unjustly by being placed in D.C. confinement."  (Doc. 1 at p. 2).  Specifically, he claims that he "never received a disciplinary for the fight in which [he] was order [sic] to due [sic] 10 days confinement for the fighting."  (Doc. 55-5 at p. 1). To the extent the plaintiff can be heard to claim that is due process rights were violated when he was not given a hearing prior to being placed in confinement, the Court concludes that the plaintiff fails to demonstrate that his placement in confinement "present[ed] the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  *Sandin v. Conner*, 515 U.S. 472, 486 (1995).  Rather, the facts show that his confinement was limited to ten days (Doc. 55-5 at p. 1) and that cell block #3, where plaintiff was confined for fighting, consisted of 4 different cell units which housed inmates held under disciplinary lockdown, protective custody or medical isolation.  (Doc. 17-2 at p. 4).  Furthermore, although the plaintiff claims that as a result of his placement in confinement he was "denied any visits, phone calls or any communication with family or attorneys" (Doc. 1 at p. 2), the plaintiff

admits that his lawyer visited him once while he was in confinement for ten days. (Doc. 26 at p. 2). Also, the record confirms that the plaintiff was allowed a visit from his family following his surgery. (Docs. 17-2 at p. 5; 17-7; 17-8). Thus, the Court concludes that the plaintiff fails to demonstrate that his confinement "exceed[ed] similar, but totally discretionary, confinement in either duration or degree of restriction." *Sandin, id.* Accordingly, the Court concludes that summary judgment is due to be granted on plaintiff's due process claim.

## IV.    CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the plaintiff.

On or before **October 11, 2019**, the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of

justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d

1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 27th day of September, 2019.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE